Filed 5/24/19 (unmodified opinion attached)

# CERTIFIED FOR PARTICAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, <br><br>     Plaintiff and Respondent, <br><br>       v. <br><br> JEDADIAH RAY BOLDING, <br><br>     Defendant and Appellant. | G055187 <br><br> (Super. Ct. No. 16CF1060) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on May 1, 2019, be modified as follows:

On page 16, at the end of the third full paragraph, after the sentence ending "186.11, subdivision (a) is reversed" add the following footnote.

> In response to the Attorney General's petition for rehearing, we emphasize that nothing in this opinion is intended to preclude nor should it be read as precluding the imposition of the white collar crime enhancement in every case involving money laundering. Our conclusion in this case is based on the record before us, in particular the jury instructions for grand theft, forgery by making false entries in books and records, money laundering, and aggravated white collar crime. Nothing in any of these instructions tied the concept of embezzlement or fraud to the elements of money laundering. Nothing in the record before us shows the jury made the necessary findings to impose the white collar crime enhancement. We are further guided by the jury's not guilty findings on the forgery charges against defendant, which contained a fraud element.

This modification does not affect a change in the judgment.  The petition for rehearing is DENIED.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


IKOLA, J.

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JEDADIAH RAY BOLDING,<br><br>  Defendant and Appellant. | G055187<br><br>(Super. Ct. No. 16CF1060)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge. Affirmed in part, reversed in part, and remanded for resentencing.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Matthew Mulford and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

---

[*]  Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.B., I.C., II., III., and IV of the Discussion section.

INTRODUCTION

Defendant Jedadiah Ray Bolding was convicted of one count of grand theft and eight counts of money laundering. On appeal, he challenges his money laundering convictions, in part, on the ground that the prosecution failed to offer sufficient evidence tracing the illegally obtained money to the monetary transactions involved in each of the money laundering counts. We conclude there was sufficient evidence supporting defendant's money laundering convictions based on the language of Penal Code section 186.10, subdivision (a), and current analogous federal law on money laundering.

Defendant relies on the single published California case that has addressed tracing under Penal Code section 186.10, *People v. Mays* (2007) 148 Cal.App.4th 13 (*Mays*). That opinion concluded that California law requires dollar for dollar tracing, regardless of the total amount of illegally obtained money, if the illegally obtained money is commingled with legally obtained money in a defendant's bank account.

*Mays* relied on federal case law that, even when the *Mays* case issued, was recognized as a minority view, and on a federal statute that has since been amended to make clear that money is fungible and that, in tracing for purposes of money laundering, the defendant's gross receipts, not profits, must be considered.

We hold that, in a prosecution for money laundering under Penal Code section 186.10, subdivision (a), when the prosecution proceeds on the theory that the defendant conducted money laundering activities "knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity," the prosecution must demonstrate that the amount of the illegally obtained funds equals or exceeds the amount of the monetary transaction. Acknowledging the fungibility of money, we also hold that, whether or not the illegally obtained funds have been commingled with legally obtained funds, the prosecution need not prove full or dollar for dollar tracing between the illegally obtained funds and the

monetary transaction, as *Mays* held. Because the statutory basis on which *Mays* rested its holding has changed, we publish our opinion to clarify the current state of the law.

In the unpublished portions of this opinion, we conclude that (1) there was sufficient evidence of money laundering in count 25 of the operative charging document; (2) defendant forfeited an issue regarding the jury instructions for the money laundering counts; (3) the sentencing enhancements for white collar crime must be reversed; (4) the trial court did not err by imposing consecutive rather than concurrent sentences on the money laundering counts; and (5) the minute order and abstract of judgment must be amended to reflect the correct amount of defendant's custody credits.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

In 2006, Defendant was hired as the controller for the Brady, Vorwerck, Ryder and Caspino law firm (the law firm). Defendant received a regular salary plus bonuses. In 2013, defendant's salary was between $105,000 and $110,000.

In late 2013, Pacific Mercantile Bank advised the law firm that defendant had cashed a large number of checks from the law firm, totaling more than $468,000 over a two-year period. When confronted by two of the law firm's partners, defendant responded, "No, that's not happening," but then admitted taking an advance against his salary once or twice. Defendant assured the partners that he had paid back the salary advances. Defendant said he would go to his office to get the paperwork, but immediately left the premises. The law firm's equity partners met and decided to terminate defendant's employment immediately.

Several days later, defendant met with three of the equity partners and explained he had taken the money to help a friend or family member. When told the partners believed he had taken $450,000, defendant responded, "I didn't think it was that much, but okay. I'm not going to dispute it. Can I find a way to pay you guys back?"

3

A forensic accountant identified a total of 524 unauthorized checks written against the law firm's payroll account that were made out to defendant, totaling $1,115,396. The unauthorized checks had all been signed by defendant. The forensic accountant also charted deposits into and expenditures from defendant's personal Wescom Credit Union account from 2007 through October 2013. In analyzing the transactions from defendant's credit union account, the forensic accountant identified the following, which comprised the basis for the money laundering counts:

*Count 20*: August 29, 2011, cashier's check for $8,000, payable to Giant RV.

*Count 21*: November 16, 2011, electronic fund transfer of $7,769.74 to Discover Card.

*Count 22*: December 1, 2011, electronic transfer of $6,000 from defendant's checking account to defendant's savings account.

*Count 23*: December 14, 2011, cashed a check for $4,675, and December 19, 2011, electronic transfer of $6,908.55 to Discover Card.

*Count 24*: December 10, 2012, electronic transfer of $6,624 for an automated clearinghouse payment to UCS online.

*Count 25*: February 12, 2013, electronic transfer of $5,000 to UCS online.

*Count 26*: June 18, 2013, electronic transfer of $5,485.48 to Discover Card.

*Count 27*: October 16, 2013, electronic transfer of $5,981.27 to Discover Card.

Defendant testified on his own behalf, and denied stealing any money from the law firm. When defendant needed extra money, his mother gave him money from a family trust. Defendant testified that the law firm's partners authorized him to receive excess expense reimbursements for looking the other way regarding accounting improprieties at the law firm. These reimbursements were input through the payroll

4

system. A forensic accountant for the defense testified to numerous transfers from the law firm's client trust account to other law firm accounts, including the payroll account and the operating account.

A jury convicted defendant of one count of grand theft (Pen. Code, § 487, subd. (a) [count 1]), and eight counts of money laundering (*id.*, § 186.10, subd. (a) [counts 20 through 27]). The jury found defendant not guilty of 18 counts of fraudulently falsifying records. (*Id.*, §§ 470, 471 [counts 2 through 19].) The jury found true the sentencing enhancement allegations that the conduct in counts 1 and 20 through 27 involved the taking of more than $500,000 (*id.*, § 186.11, subd. (a)(1), (2)); that the transactions represented by counts 20 through 27 involved more than $50,000 but less than $150,000 (*id.*, § 186.10, subd. (c)(1)(A)); and that the value of the property loss in count 1 was in excess of $200,000 (*id.*, § 12022.6, subd. (a)(2)).

The trial court sentenced defendant to 10 years in state prison: an aggravated term of three years on count 1; a consecutive five-year term for the Penal Code section 186.11, subdivision (a) enhancement; and a consecutive two-year term for the Penal Code section 12022.6, subdivision (a)(2) enhancement on count 1. The court imposed a three-year aggravated term on each of the money laundering charges, and ordered that those sentences be served concurrently to the sentence on count 1. The Penal Code section 186.10, subdivision (c)(1)(A) enhancements on counts 20 through 27 were stricken for purposes of sentencing. In addition to other fees and fines, the court ordered defendant to pay $1,115,396 plus interest in restitution.

DISCUSSION

I.

*SUFFICIENT EVIDENCE SUPPORTS THE MONEY LAUNDERING COUNTS.*

Defendant argues that the prosecutor failed to offer sufficient evidence that more than $5,000 alleged to have been laundered in each of counts 20 through 27 was

derived from the proceeds of criminal activity. We review the record in the light most favorable to the judgment to determine whether the evidence is reasonable, credible, and of such solid value that a reasonable trier of fact could have found defendant guilty. (*People v. Carter* (2005) 36 Cal.4th 1114, 1156; *People v. Davis* (1995) 10 Cal.4th 463, 509.)

A.

*Tracing*

As is relevant to the theory pursued by the prosecutor, Penal Code section 186.10, subdivision (a) provides: "Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($5,000) . . . through one or more financial institutions . . . knowing that the monetary instrument represents the proceeds of, or is directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering."

Defendant concedes that he engaged in monetary transactions of more than $5,000 through his Wescom Credit Union account on eight occasions.[1] Defendant contends, however, that the prosecutor failed to establish that at least $5,000 of each of those monetary transactions could be traced to criminal activity—the money embezzled from the law firm by defendant—and that defendant knew that money was from an illegitimate source. Thus, the issues for us on appeal are (1) whether the prosecution was required to trace the embezzled money to the charged monetary transactions, and (2) whether the prosecution did so.

---

[1] With regard to count 25, involving a transaction alleged to be in the amount of $5,000, as explained *post* in part I.B., there was evidence of additional transactions within a seven-day period that raised the total to more than $5,000.

6

1. *Mays, supra*, 148 Cal.App.4th 13

*Mays, supra,* 148 Cal.App.4th 13 was the first, and remains the only, published case in California addressing tracing under Penal Code section 186.10. In *Mays*, the defendant was convicted of pimping and money laundering. The money laundering counts involved checks written for rent on the office through which the defendant ran his prostitution business, rent on a residence at which the prostitutes lived, and bills for cell phones used in the business. (*Mays, supra,* 148 Cal.App.4th at pp. 18, 20.) The trial court concluded that a prosecution, based on the same theory employed here, namely that a defendant conducted "a transaction through a financial institution with a monetary instrument of $5,000 or more based on the knowledge of criminal proceeds theory, requires proof that (1) the defendant's entire business was illegal, (2) there were deposits of $5,000 or more in criminally derived funds, or (3) there was a transfer of all funds out of the account." (*Id.* at p. 32.)

*Mays* held that under such a theory, the prosecutor must trace the full amount of the monetary transaction to the illegally obtained money. "[T]he statutory language provides that the monetary instrument or instruments must be composed of at least $5,000 of proceeds from criminal activity; that is, there must be proof that the monetary instrument involved $5,000 of criminal proceeds; it is not sufficient merely to show the transaction was of more than $5,000 and from an account with commingled funds. [¶] . . . [¶] We are unpersuaded by the Attorney General's argument that the legislative intent for a broad definition of 'transactions' supports its interpretation of the statute. In light of the words of the statute and the legislative history, the $5,000 minimum amount applies to the amount of the criminal proceeds that must be involved in the monetary instrument(s). Therefore, it is not sufficient to show that the transaction involved over $5,000 and some portion of this amount derived from criminal activity; there must be a showing that at least $5,000 of the amount involved in the transaction is related, directly or indirectly, to criminal activity. [¶] We . . . conclude a Penal Code

7

section 186.10, subdivision (a) prosecution based on a defendant's conducting a transaction through a financial institution with a monetary instrument of $5,000 or more based on the knowledge of criminal proceeds theory, requires proof that (1) the defendant's entire business was illegal, (2) there were deposits of $5,000 or more in criminally derived funds, or (3) there was a transfer of all funds out of the account. [¶] In this case, the prosecution proved [the defendant] had the intent to promote or facilitate criminal activity through monetary instrument(s) of $5,000 or more, all the funds represented criminally derived funds, there were deposits of $5,000 or more in criminally derived funds, and there were transfers out of an account that exceeded the clean money in the account." (*Mays, supra,* 148 Cal.App.4th at pp. 31-32, fn. omitted.)

*Mays, supra*, 148 Cal.App.4th 13 ultimately concluded that the prosecution had provided sufficient evidence of tracing, despite defendant's testimony that he earned income from other, legitimate businesses, and the evidence that a percentage of the defendant's customers paid only for escort services, and not for sexual services. (*Id.* at pp. 33-35.) Because the defendant did not offer any evidence that his legitimate interests generated any money, "a reasonable jury could conclude [his] music and graphic businesses were mere hobbies, funded by his escort/prostitution business, rather than businesses that generated profits that were deposited in the financial institutions." (*Id.* at p. 34.) Further, because the escort and prostitution businesses were "inextricably intertwined," the income generated from the escort services constituted the indirect proceeds of the prostitution business—a criminal activity. (*Id.* at pp. 34-35.) The opinion's holding left open the possibility that complete tracing need not be performed if the facts of the case permit sufficient reasonable inferences to be drawn regarding the source of the monetary transactions.

Defendant argues that because his legitimate income (a salary of at least $105,000 in 2013) and legitimate expense reimbursements and bonuses were deposited in the same Wescom Credit Union account as the embezzled funds, and was sufficient to

8

cover the amounts of the monetary transactions represented by counts 20 through 27, those convictions must be reversed.

2. Analysis of *Mays*; Federal Court Decisions and a Change in Underlying Federal Statute Support the Majority View that Dollar for Dollar Tracing Is Not Required

The Attorney General argues that *Mays* was incorrectly decided and should not be followed by this court. To determine whether tracing was required for a Penal Code section 186.10 violation, the court in *Mays* looked to the federal money laundering statutes: sections 1956 and 1957 of title 18 of the United States Code (hereafter "section 1956" and "section 1957," respectively), and to federal cases interpreting those statutes.

*Mays* concluded that the theory under which the prosecution proceeded in that case (which is also the theory used in the present case) was comparable to a violation of section 1957. "Section 1957 punishes a person who 'knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.' [Citation.] A 'monetary transaction' includes a deposit or withdrawal. [Citation.] '"[C]riminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.' [¶] 'Because the recipient need not actually exchange or launder the funds or have any specific intent to further or conceal unlawful activity, [section] 1957 potentially criminalizes seemingly "innocent" acts or commercial transactions. In enacting [section] 1957, Congress intended to dissuade people from engaging in even ordinary commercial transactions with people suspected to be involved in criminal activity. However, [section] 1957 does require that the violator "knowingly" engage in a transaction involving criminally derived property.'" (*Mays, supra*, 148 Cal.App.4th at p. 24.)

While recognizing that some federal courts had concluded that no tracing was required in a section 1957 prosecution, the *Mays* court relied on the holding of *U.S. v. Rutgard* (9th Cir. 1997) 116 F.3d 1270 (*Rutgard*) regarding tracing under

9

section 1957: "In sum, the *Rutgard* court, after noting section 1957 was a potentially draconian law because it eliminated criminal intent, concluded that in a section 1957 case involving commingled funds, the government could show: (1) the defendant's entire business was illegal; (2) a single deposit of $10,000 or more in criminally derived funds; or (3) all the funds were transferred out of the account. The *Rutgard* court rejected the theory that proof of criminally derived funds in an account creates a presumption that those funds are involved in a later transfer from the account." (*Mays, supra,* 148 Cal.App.4th at p. 28.)

We have identified two significant problems with the continued use of the analysis of *Mays*. First, while never overruled, the federal case on which *Mays* based its analysis, *Rutgard*, has been recognized as representing a "minority view" with respect to tracing. (*U.S. v. Braxtonbrown-Smith* (D.C. Cir. 2002) 278 F.3d 1348, 1354.) As we discuss, we believe the majority view is based on a sounder analysis.

The majority view, as summarized by the Fourth Circuit Court of Appeals, is: "Money is fungible, and when funds obtained from unlawful activity have been combined with funds from lawful activity into a single asset, the illicitly-acquired funds and the legitimately-acquired funds (or the respective portions of the property purchased with each) cannot be distinguished from each other [citation]; that is, they cannot be traced to any particular source, absent resort to accepted, but arbitrary, accounting techniques [citation]. As a consequence, it may be presumed in such circumstances, as the language of section 1957 permits, that the transacted funds, at least up to the full amount originally derived from crime, were the proceeds of the criminal activity or derived from that activity. [Citations.] A requirement that the government trace each dollar of the transaction to the criminal, as opposed to the non-criminal activity, would allow individuals effectively to defeat prosecution for money laundering by simply commingling legitimate funds with criminal proceeds." (*U.S. v. Moore* (4th Cir. 1994) 27 F.3d 969, 976-977; see *U.S. v. Silver* (S.D.N.Y. 2016) 184 F.Supp.3d 33, 51-52.)

10

Even before *Rutgard* was decided, a majority of other courts had employed an analysis when tracing in money laundering cases recognizing that money is fungible. As explained by the Tenth Circuit Court of Appeals: "The government had the burden of showing that the criminally derived property used in the monetary transactions was in fact derived from specified unlawful activity. This does not mean, however, that the government had to show that funds withdrawn from the defendant's account could not possibly have come from any source other than the unlawful activity. Once proceeds of unlawful activity have been deposited in a financial institution and have been credited to an account, those funds cannot be traced to any particular transaction and cannot be distinguished from any other funds deposited in the account. The 'tainted' funds may be commingled with 'untainted' funds, with the result being simply a net credit balance in favor of the depositor. The credit balance gives the depositor a claim against the bank and allows him to withdraw funds to the extent of the credit. In the context of a withdrawal, the portion of § 1957 requiring a showing that the proceeds were in fact 'derived from specified unlawful activity' could not have been intended as a requirement that the government prove that no 'untainted' funds were deposited along with the unlawful proceeds. [Citation.] Such an interpretation would allow individuals to avoid prosecution simply by commingling legitimate funds with proceeds of crime. [Citation.] This would defeat the very purpose of the money-laundering statutes." (*U.S. v. Johnson* (10th Cir. 1992) 971 F.2d 562, 570.)

Second, since both *Rutgard* and *Mays* were decided, section 1957 has been amended to include a definition of "proceeds." In *U.S. v. Santos* (2008) 553 U.S. 507, the Supreme Court held that the word "proceeds" in section 1956 was ambiguous and could mean profits or receipts. (*U.S. v. Santos, supra,* 553 U.S. at p. 511.) Under the rule of lenity, the court interpreted proceeds as meaning profits because to trace the money laundering transaction to the defendant's profits would require more from the prosecution in order to obtain a conviction. (*Id.* at pp. 513-514.)

11

In 2009, Congress amended section 1956 to add a definition of proceeds as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, *including the gross receipts of such activity.*" (§ 1956(c)(9), italics added.) Section 1957 incorporates the definition of proceeds from section 1956. (§ 1957(f)(3).)

We hold that, when a defendant is charged with money laundering "knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity," the prosecution must demonstrate that the amount of the illegally obtained funds equals or exceeds the amount of the monetary transaction, whether or not the illegally obtained funds have been commingled with legally obtained funds. (Pen. Code, § 186.10, subd. (a).) The prosecution need not trace every illegal dollar to the monetary instrument. In this case, there was sufficient evidence that the amount of money defendant embezzled from the law firm and placed in his Wescom Credit Union account was greater than the amount of the monetary transactions charged in the money laundering counts. Therefore, defendant's convictions for money laundering must be affirmed.

### B.

*There Was Sufficient Evidence of a Monetary Transaction Exceeding $5,000 for the Count 25 Money Laundering Conviction.*

Defendant argues the conviction for money laundering in count 25 must be reversed because the money laundering statute requires proof of a transaction exceeding $5,000, while the prosecutor proved a transaction in the exact amount of $5,000. We conclude that there was sufficient evidence supporting the conviction on count 25.

Although the summary exhibit prepared by the prosecutor referred only to a $5,000 electronic transfer to UCS on February 12, 2013 in support of count 25, evidence established that defendant made withdrawals totaling more than $5,000 within the

12

statutorily permitted seven-day period. Specifically, in addition to the $5,000 electronic transfer on February 12, defendant made ATM withdrawals, online payments, and debit card purchases from the same Wescom Credit Union account between February 13 and February 15.[2]

This issue was first identified by the jury during deliberations. After confirming that one transaction of $5,000 would not violate the money laundering statute, the jury sent the following note to the court: "The district attorney presented us with a summary sheet listing Mr. Bolding's transactions on or about February 12, 2013 as one $5000 disbursal. However, the detailed bank statement for count 25 has withdrawals totaling more than $5000 within a 7-day period. Should we rely on the summary or the bank statement detail?"

The court instructed the jury: "Certain charts and summaries have been admitted in evidence. Charts and summaries are only as good as the underlying supporting material. You should, therefore, give them only such weight as you think the underlying material deserves." Defendant's trial counsel agreed this was an "accurate statement of the law" and the defense was therefore "fine" with giving it to the jury.

## C.

*Defendant Forfeited the Issue of the Jury Instruction Regarding the Money Laundering Counts; in any Event, the Instruction Is Correct.*

The trial court instructed the jury with CALCRIM No. 2997, in relevant part, as follows: "The defendant is charged in Counts 20 through 27 with money laundering in violation of Penal Code section 186.10. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant conducted one or more financial transactions involving at least one monetary instrument through at least

---

[2] Defendant did not address this issue in his appellate reply brief.

13

one financial institution; [¶] 2A. The defendant conducted the financial transactions within a seven-day period and the monetary instruments involved had a total value of more than $5,000; [¶] and [¶] 3A. The defendant knew that the monetary instruments represented the proceeds of criminal activity or were derived directly or indirectly from the proceeds of criminal activity."

Defendant argues that the instruction was incorrect because it failed to instruct the jury that "at least $5,000 of the amount involved in the transaction is related, directly or indirectly, to criminal activity." (*Mays, supra,* 148 Cal.App.4th at p. 31.)

The Attorney General argues that defendant forfeited the right to challenge the instruction on appeal.[3] Defendant did not object to the instruction at trial or request that the trial court modify it in any way. (*People v. Lee* (2011) 51 Cal.4th 620, 638 ["A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"]; *People v. Hudson* (2006) 38 Cal.4th 1002, 1012 ["'[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language'"].)

In *Mays*, the appellate court concluded that the language of Penal Code section 186.10, subdivision (a) is "sufficient to instruct the jury as to the elements of the offense." (148 Cal.App.4th at p. 36.) Defendant concedes in his appellate reply brief (albeit in connection with his argument regarding the white collar crime enhancement) that CALCRIM No. 2997 "mirrors the elements of the offense set forth in Penal Code section 186.10, subdivision (a). Nothing in either the statute or the jury instruction requires a finding that the minimum $5,000 monetary transaction be derived from criminal activity resulting from fraud or embezzlement."

---

[3] Defendant did not address this argument in his appellate reply brief.

Because the pattern jury instruction correctly sets forth all of the elements of the crime, and defendant did not request any modification of the pattern instruction, his challenge on appeal has been forfeited.

## II.

*THE WHITE COLLAR CRIME ENHANCEMENT UNDER PENAL CODE SECTION 186.11, SUBDIVISION (A) MUST BE REVERSED.*

The jury found true the white collar crime enhancement alleged against defendant. Penal Code section 186.11, subdivision (a) provides, in relevant part: "(1) Any person who commits two or more related felonies, *a material element of which is fraud or embezzlement*, which involve a pattern of related felony conduct, and *the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity* of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison . . . . This enhancement shall be known as the aggravated white collar crime enhancement. . . . For purposes of this section, 'pattern of related felony conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events. . . . [¶] (2) If the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison." (Italics added.)

Neither fraud nor embezzlement is a material element of Penal Code section 186.10, which criminalizes money laundering. Fraud was a material element of the charges of falsifying records, but the jury found defendant not guilty of all of those

15

charges. (Pen. Code, § 471.) Embezzlement was a material element of the crime of grand theft, but because that was charged as a single felony, the white collar crime enhancement could not be imposed unless defendant was convicted of another relevant felony.

The Attorney General argues that because the theft of money from the law firm was based on a theory of embezzlement, the money laundering counts necessarily required proof of embezzlement. Nothing in the money laundering statute permits, much less requires, the addition of elements of other crimes to the elements of money laundering.

The Attorney General also argues that "money laundering intrinsically involves a fraud against society in general." That may be true, but committing the crime of money laundering does not require proof of fraud on the part of the defendant.[4]

The sentencing enhancement imposed pursuant to Penal Code section 186.11, subdivision (a) is reversed.

III.

*THE TRIAL COURT DID NOT IMPROPERLY IMPOSE CONSECUTIVE SENTENCES.*

Defendant argues that the trial court erred in imposing consecutive sentences for counts 20 through 27 in violation of Penal Code section 654 because those crimes resulted from a single, indivisible course of conduct to accomplish a single objective.

Penal Code section 186.10 explicitly excludes its provisions from section 654: "*Notwithstanding any other law*, for purposes of this section, each

---

[4] Defendant argues that the minute order and abstract of judgment must be corrected to reflect that the white collar crime enhancement was imposed once for all money laundering counts. Penal Code section 186.11, subdivision (a) permits the trial court to impose the sentencing enhancement once in a case. Our holding that the white collar crime sentencing enhancement must be reversed moots this issue.

16

individual transaction conducted in excess of five thousand dollars ($5,000), [or] each series of transactions conducted within a seven-day period that total in excess of five thousand dollars ($5,000), . . . *shall constitute a separate, punishable offense*." (Pen. Code, § 186.10, subd. (b), italics added.)

"It is assumed that the Legislature has in mind existing laws when it passes a statute." (*Estate of McDill* (1975) 14 Cal.3d 831, 837.) Here, in enacting Penal Code section 186.10, it is presumed that the Legislature was familiar with Penal Code section 654. The California Supreme Court has recognized that the Legislature has the power to override section 654 in specific circumstances and that it need not specifically cite section 654 to do so. (See *People v. Benson* (1998) 18 Cal.4th 24, 32-33.) When the language of a criminal statute provides that "[f]or purposes of prosecution under this section, each act . . . shall be considered a separately punishable offense," that statute is excluded from the provisions of Penal Code section 654. (*People v. Gangemi* (1993) 13 Cal.App.4th 1790, 1800, citing Pen. Code, § 115, subd. (d).) Based on the plain language of Penal Code section 186.10, subdivision (b), defendant's convictions pursuant to Penal Code section 186.10, subdivision (a) were not subject to the prohibition of multiple punishment under Penal Code section 654.

## IV.

### *DEFENDANT'S PRESENTENCE CUSTODY CREDITS MUST BE CORRECTED.*

Defendant argues, and the Attorney General agrees, that defendant is entitled to two additional days of presentence custody credit. The trial court did not count the day defendant was taken into custody when determining his actual custody, and thus when determining his conduct credit under Penal Code section 4019.

Defendant was taken into custody on April 21, 2016, and sentenced on June 2, 2017. Defendant was entitled to 408 actual credit days and 408 conduct credit

17

days.  We will direct the trial court to correct the minute order and the abstract of judgment to reflect 816 total days of presentence credit.

DISPOSITION

The white collar crime sentencing enhancement under Penal Code section 186.11, subdivision (a) is reversed.  In all other respects, the judgment is affirmed.

We remand the matter for resentencing consistent with this opinion.  We direct the trial court to correct the minute order, and to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.

FYBEL, J.

WE CONCUR:

O'LEARY, P. J.

IKOLA, J.

18